and 131718 and 131719, Municipality of San Juan, et al. v. Wachtower Bible and Tract Society of New York, Incorporated, et al. Let's let counsel get settled behind you. Very well, Your Honor. You may proceed. Thank you, Chief Judge Lynch. Good morning, Your Honors. My name is Paul Polidoro. I have the privilege of representing Jehovah's Witnesses this morning. Chief Judge Lynch, may I reserve three minutes for rebuttal? Yes, you may have it. Thank you, Your Honor. This case was first before this Court four years ago. As a result, this Court ordered the District Court to take prompt action to remedy denials of access to public streets. And yet we find ourselves once again before this Court asking for assistance because of two reasons. First, the District Court did not apply this Court's clear direction that unmanned gates should have guards. And second, because the District Court issued a sua sponte dismissal of all Commonwealth defendants, effectively removing them from the remedial process. Now, as to unmanned gates, we submit that the language and the direction in this Court's first opinion was crystal clear, that the unmanned gates needed a period of time within which to retain guards. Now, this Court did recognize that there was a limited exception for urbanizations that might be very small or have very limited resources. And those should be allowed to come forward and bear the burden of showing the District Court that they met the burden of special justification why they should not retain guards. However, the District Court turned this exception into the rule, and a rule that no unmanned gates needed to retain security guards. And we submit that this was in clear contradiction to the clear rule of this Court. Well, with all due respect, Counsel, I think that you may be confusing the Court's discussion of the issue with what the Court's holding was. Yes, the Court held that the unmanned gates created a denial of access and a First Amendment problem. But I, at least, have never read the first Watchtower opinion, an opinion of which I was part, as being the holding as to what remedy for that perceived violation the District Court had to apply. Yes, we discussed some options. We discussed that the unmanned gates couldn't be allowed to exist as they were. But I don't read the opinion as limiting the District Court's discretion as to how to fashion an appropriate remedy for that violation. Your Honor, as we read the Court's opinion, clearly this Court held that when Jehovah's Witnesses are unable to access public streets, a constitutional violation takes place. That's true. And the Court, we submit, sketched principles that should guide the District Court in crafting relief. But the principle is a principle of affording reasonable access. And the District Court has attempted to meet that principle. Whether it met it correctly is certainly open for debate, and I'd be interested in your views as to whether or not the District Court's remedy really does the trick, whether it does afford reasonable access. But that's a different issue than saying the District Court was bound to do something. I don't think we bound the District Court to any particular remediation. We said, yeah, go ahead. It would be helpful if you told us why you thought the remedy was insufficient for the violation of constitutional rights. Very well, Your Honor. Thank you. We submit that there is simply no precedent that allows the government to require an advocate to carry a key to walk down a public street to engage in advocacy. Further. But why is carrying a key any more burdensome than presenting yourself to a guard and making the explanation? I mean, we're not going to find precedence because Puerto Rico has put in place a regime here that, to my knowledge, is unprecedented, gated communities that use public streets. Now, they have a public safety rationale for doing that, all right? But now we've got to find a way to modify that regime to accommodate First Amendment rights. The District Court says, I'll supply access by requiring the municipalities to provide keys. Why is that inadequate, at least without some experience as to how it operates? Why is it on its face inadequate or less adequate than having to present yourself to a guard during limited hours or the other remedies that we discussed, possible remedies that we discussed in our original opinion? Two answers to that, Judge Selye. First, in order to obtain that key, one has to bring a federal lawsuit. Now, the Supreme Court in the Stratton decision said that it's unconstitutional to force an advocate to go to town hall. But you have obtained the key, and in order to obtain the placement of guards, which is the alternative remedy that you're seeking, all right, you would have had to bring the lawsuit. Neither existed without the bringing of the lawsuit. And you were interested here in the First Amendment rights of your plaintiffs, all right? So we now have an adjudication that there's a violation that your plaintiffs are entitled to redress, all right? And I'm struggling with the notion of why this redress, at least without a fair trial, is insufficient. Your Honor, we turn our attention to San Juan's brief at page 47. The government speaks to what an administrative nightmare this regime has caused for it, the need to continue to update the beepers, to administer the change in access codes. Now, this is the government with all its resources saying this is a burdensome scheme that the district court has done. How much more so is the burden being put upon the advocate who not only needs to deal with this scheme in San Juan, but in all the other seven municipal defendants here? What is actually happening? Just give me an example of how this combination of agreement and injunction has actually worked. Your Honor, it's provided a resolution virtually to all the manned guards within the municipal defendants. We still have problems. We still call the police. There is a problem with respect to the Commonwealth police participation. But Judge Halpe's enforcement of the manned aspect of this court's decision is working quite well. With respect to the unmanned gates, it's just a practical problem, Your Honor. It's not one advocate who's using a key to access particular urbanization. There are multiple congregations, English, Spanish, Chinese, sign language, who has to figure out a way to use the one key. And then as San Juan correctly posits. So does that mean that there is some centralized Jehovah's Witness group that sort of allocates the key? Is that how it works? What was done is that the municipality would turn over the key to a central group, and the central group would give it to one congregation. And then it would be up to the congregations to figure out how to use that one key among the various individuals who want to preach in a particular urbanization. So maybe they all have to show up at 8 a.m. or whatever time they pick. And then do you have different congregations wanting the key for the same days? No, Judge, there has been a measure of coordination, but clearly that requirement eliminates spontaneity that the Supreme Court says is allowed upon an advocate, which was the beauty of this court's decision in requiring unmanned gates to have guards. It firmly protected well-established free speech rights. Has the district court ever held a hearing on the burdens attendant on the key arrangement? Your Honor, the district court held what it called a final dispositional hearing in which it had evidence before it, which was affidavits that showed that there were unmanned gates within the municipal defendants. One of the municipalities had witnesses and other evidence that they decided not to submit. We've argued at that hearing what the burdens would be. We argued what we felt this court's opinion required, and the district court judge held that keys, beepers, and access codes would be turned over. Now, do you or do you not accept the proposition that there might be some arrangement that would be the functional equivalent to a manned gate, although not a manned gate itself? Yes, Your Honor, I think when we look at this court's decision, it did recognize that some urbanizations may be very small, perhaps one or two dozen homes, or have very limited resources, and something else would be required. However, as this court's opinion also recognized, the average number of homes in these urbanizations are well in excess of 100. Some have 200 or 300 homes. So those are functional equivalents of public streets that exist everywhere. And with respect to our access to the public streets, I turn this court's attention to the denial of the Commonwealth to assist Jehovah's Witnesses' access to public streets when we've had difficulties. Now, we submit, Your Honor, that the Commonwealth has submitted no rationale whatsoever that supports its dismissal in this case, that it was not a proper party. In your view, there is no question the district court considered, after its order denying the reconsideration, that it considers this key arrangement to be a permanent one? It does, Your Honor. A permanent equitable remedy that satisfies the mandate of this court? That's quite correct, Judge Ripple. And Judge Helpe spoke in terms of it being extended throughout the island. Not a temporary arrangement while everybody tries to work out a mandate or its functional equivalent? That's quite correct, Your Honor. It's quite permanent. And your view is this is in no way the functional equivalent of a mandate? That's correct, Your Honor. Now, with respect to the Commonwealth, we submit that the Commonwealth has rulemaking authority, and it has a police force that can assist Jehovah's Witnesses when Jehovah's Witnesses are denied access to streets. Now, we have submitted in the record instances where we call the Commonwealth police, and the Commonwealth police say to us, we're sorry, we cannot help you. Now, the Commonwealth made representations to the district court, made representations to this court, that it would take all necessary measures to enforce this court's order. And we submit that they have an obligation to and responsibility to enforce federal law within its jurisdiction. Now, the state police is a very simple solution. They could simply order their state police to assist Jehovah's Witnesses, but they fail to even take that simple step. And I submit, Your Honors, that they're not going to participate voluntarily in assisting Jehovah's Witnesses, and thus they need to be returned to the case. But these instances that you're complaining about have arisen since the district court entered what it called its final order, and the keys were then distributed. Your Honor, the failure of the Commonwealth police to assist Jehovah's Witnesses has been going on for the pendency of this case for 10 years. No, no, but I'm talking about your complaint, I thought, was with their failure to assist with respect to allowing entrance by Jehovah's Witnesses who had keys to the unmanned. No, no, Your Honor. It was with respect to guards at man gates that refused to give Jehovah's Witnesses access. So then what role do you see for the Commonwealth as to the alternatives, the keys, the beepers, the access codes? I think they have multiple roles. First, their police can enforce this court's order as to man gates. I'm not on man gates. As to unmanned gates, Your Honor? I'm on the functional alternative. What role do you see the Commonwealth? They have retained rulemaking authority. Their planning board has retained authority over public streets, so they have the authority to enforce this court's order. What do you want? What are the rules in these alternative situations? What we would submit, Your Honor, what we want is for the unmanned gates to retain guards island-wide. And then if Jehovah's Witnesses are denied access, they call the police, and the police let them in. Many of these are very, very poor communities under extreme pressure. The crime rate in Puerto Rico is extraordinary. And you're saying to the residents of these communities, you now have to have someone on 12-hour shifts every day at the gate so that the Jehovah's Witnesses can come in, although you haven't had the resources to do it before now? Your Honor, I turn the court's attention to the record with respect to how close Jehovah's Witnesses came to an agreement with the municipality of Ponce. The first prong of that agreement was that the urbanizations would retain guards. If they didn't have the financial resources to retain guards, they could employ a virtual guard system, which is used throughout Puerto Rico. It's a camera that could allow access. If they weren't able to do that, then the municipal police of Ponce would assist Jehovah's Witnesses. If that was not a remedy, then the gates would be left open during daylight hours. I'm sorry. So you call the police, and what do you want them to do? They come to the gate. They say to the guard, why are you not letting Jehovah's Witnesses in? No, there is no guard at this gate, by definition. Correct. But with respect to the unmanned, if they could not hire a guard, if they could not do virtual camera solution, then the gates would be left open during daylight hours. So the public streets and the unmanned urbanization would be the same as public streets everywhere else in the United States. So you upset the scheme that Puerto Rico has set up, and you require them to have open gates. No, Judge, I don't think we upset the scheme. This court recognized that unmanned gates was not in the statute. When we read the statute, the Controlled Access Statute calls for a human being to be at the gate to assist the police in their surveillance duties. This court recognized, and I think the Commonwealth recognized, that unmanned is not within the statute. So if we talk about the statute. Has the Puerto Rican Supreme Court looked at that issue? Refused to take the issue of unmanned gates, Your Honor. It refused? It refused. Okay. Thank you, Judge. Thank you. May it please the Court. I'm Michael McCaul. I represent the municipality of Cagwis, and for the purpose of the argument, the other six municipalities in the joint appeal. In 2011, we came before this court, and the panel issued a decision, and a decision on reconsideration. The municipalities understand that this circuit through the panel at that point, while reversing, while affirming Judge Pieris's ruling as to the facial challenge, on the as applied, thought that there may need to be some tinkering with the scheme. But it specifically said at that time, both in the original decision and the April one, on denying and bank, that it was not finding that there had been constitutional violations established against either any of the municipalities or any of the urban associations. We understood that, and part of the problem was the evidentiary issues before the court, what was properly evidenced before, because there's been a lot of statements in the briefs and throughout this, statements of counsel, that really are not supported. Are you arguing that you have no obligations here? No, Your Honor. Because liability has not been shown. What we are arguing is that we understood that when this case went on remand, that Judge Shelby had to Answer my question. What are you arguing? Are you here about the remedy, or are you here saying we have no obligation to do anything? We're here on two points, Your Honor, if I could. State them. Number one? One is that we understood that the district court needed to hold an evidentiary hearing and to find constitutional violations under Section 1983 against admissible defendants before it went to the remedial scheme. Number two? The second argument is that, as to that, that the injunctive relief issued by the court didn't have the findings and was not supported. On the remedial stage as well, if we get to that point I'd like you to assume, arguendo, that your municipality is under some obligation to accommodate the First Amendment rights of the plaintiffs. And that this isn't a matter of evidentiary findings. Just assume that. Now, what's wrong with the remedy? What we understand, Your Honor, is that prior to the second hearing held by the court in 2013, there had been a lot of time spent trying to negotiate a solution with the plaintiffs in this. Yes, and I think it's admirable that everyone here has spent so much time trying to work out a solution. The problem that we had at that point is, sitting at the negotiating table, the plaintiffs really were not willing to consider what we understood to be feasible options, options that these communities could adopt that were not financially prohibitive. And we did a joint motion. Okay, so what's the objection to the court order? It specifically said that the municipality should have flexibility, leeway to come up with creative solutions, and that there shouldn't be a one-size-fits-all solution. Based on that, for example, COGWIS spent a lot of time going community by community, talking to them and finding out what were the specifics of that. They did an action plan that they proposed to the court. What's wrong with the court's order? The court says that what we understand is the court rejected the possibility that a community be allowed to open their community for certain days and certain weeks. What we think is implicit in the original panel discussion, when they talked about in certain cases there may need to be a guard on certain days and certain hours, we think opening the gates on certain days is a functional equivalent of that. And, in fact, there's not any filter with a guard there. It is more protective, First Amendment speech, and that that option was rejected by the district court. And we believe it's a constitutionally viable option that we would ask that this court put its imprimatur that that should be one of the options. The motion that we filed requested the court, we put four options, any of which, if the Urban Association chose to adopt, would resolve the issue of access, we understood. What are the others? To propose a key, to give a key to the Jehovah's Witnesses, to give a beeper, to give an access control, or to choose to allow the gates to be open on specific days. Because the problem we have is, if I could finish this one statement, Judge Salyer, is that the unmanned gates itself may or may not be a barrier to access to speech. And a good example is Esmeralda Community in Coghlas. It has a gate for cars coming in. Right next to it, it has a pedestrian gate that's been open 24 hours, seven days a week since its inception. The fact that you have an unmanned gate here has never been a barrier of access to Jehovah's Witnesses going through the pedestrian gate and being able to preach. And we understood that there needed to be findings of fact as to these particular communities, that there really was a denial of access. But there's a practical problem here. What you're saying makes a certain amount of sense. But the district court hasn't locked in this remedy for every urbanization. What the district court has said is the urbanization should provide a key unless they have some special reason for not doing that. Now, the Esmeralda urbanization, I would assume, can come forward if it objects to providing a key and saying we shouldn't have to provide a key because we have a pedestrian gate that's open 24 hours a day to anyone and that provides constitutionally sufficient access. If that rationale is found by the district court to be persuasive, that urbanization won't have to provide a key, but you have to start somewhere. Because the communities are before the district court,  or the urbanizations that the communities haven't even yet licensed, which may year after be billed. Respectfully, Your Honor, we understood that when Judge Pierce issued the order in September of 2006 and he allowed Leith to amend the complaint, and he said that the plaintiffs had the obligation to bring every community that would be affected by the remedy sought, the language of that, communities, referred to urban associations  but Judge Gelby has administered the case differently. He has certain specific communities in front of him. He feels that that's sufficient to allow him to afford relief in those communities without going further. I understand that there are other communities that are not affected by this order and that those are going to have to be worked out by the plaintiffs with those communities, and I understand that within your communities there are particular urbanizations that may want to propose other solutions. What's your thought about the mechanism that Judge Gelby has provided for the justification? As I understand it, his mechanism is present your case for special justification to the municipality, which then has power to act on it. Well, one thing, Your Honor. Just answer my question. Do your clients object to that method for resolving the question of special justification? Well, that's what I was trying to get at, Your Honor. We understood if the method that was accepted was to give a key or a beeper or an access code that the Jehovah's Witness have an ability to get in and preach, there no longer is a First Amendment violation at that point. We understood that the whole special justification really dropped out because there was no longer any constitutional violation. No, but the special justification is for the protection of the urbanization. As I read Judge Gelby's order, he says that if giving a key causes special hardship to any particular urbanization, use the Esmeralda urbanization, for example, where you say giving a key is unnecessary, they can make their case for special treatment to the municipality. Okay. I guess some problem we have with this is that the special justifications, if you go into that, what exactly it entails, and the municipality of San Juan at one point requested, said these are some of the factors that we think we would consider in doing that. Would this satisfy? And we really got no guidance on that, and we're kind of between a rock and a hard place in that we have urban associations that have property interests in the access control regimes they put in place. Many urban associations that are not before the court in that they were not sued, and yet the remedy that has been applied potentially can affect or even take out the property rights. For example, in Garabo, there were two urban associations, Preciosa and Heavenly View, that claim we have private roads. We're not within the scope of the First Amendment in this. The judge says you're ordered to provide this relief or the municipality should go in and take that out. And then he certified it, yet these parties are not before the court, and if the municipality takes their property away under a standard that we're not sure we could be subject to suit from them for violating their due process rights. Counsel, are you here because you're afraid sanctions are going to be imposed on you for noncompliance? We honestly thought, Your Honor, that when we proposed the scheme of a key or an access, that the special justifications at that point were not needed, or if they were, then we need some guidance as to what it was. Could you answer my question? Have you been sanctioned for violating the court order as you've interpreted it? The various municipalities, not on the special justifications, Your Honor, if that's what you're asking. There have been sanctions imposed. There were sanctions imposed on Garabo in the incident I gave with the private roads example, but that wasn't the special circumstances. But this uncertainty as to what would satisfy that troubles us. So that's one of the... All right. But we are not here on a case of the district court irrationally sanctioning a municipality, which has, for example, offered a key. Well, actually, Your Honor, what we originally understood the order, and the written order that came down after the hearing said to provide a means of access, and the municipalities came forward with keys or beepers. They were then sanctioned because they didn't have a key and a beeper and a key and a beeper and an access code. And so there were sanctions when we thought we were in facial compliance with the order as written. And several, and there's been controversies at the gates with representatives of the urban associations saying that you're not protecting our interests. And the problem is they're not before the court. They have property and security rights. In several instances they've asked to be heard. FEM asked to intervene. Riverside and Tree Draw also asked because they understood their property rights were being impaired. And the court has refused to allow them, saying the municipality shall act in their interest. And we are in conflict of interest at times. Okay. Thank you. Thank you, Your Honor. Good morning, Your Honors. May I please the court? My name is Rosa Maria Cruz. I represent the municipality of San Juan. Thank you. Would you speak up at this point? Sure. Good morning. May I please the court? My name is Rosa Maria Cruz. I represent the municipality of San Juan. We will assume, as the court has requested us, that plaintiffs indeed have some constitutional right that the municipalities must assist them to be able to get into these unmanned urbanizations. But we believe there are two critical matters with the order issued by the court, the district court. The first one is that we really do not read the special justification issue as allowing the urbanizations come forward to justify why they don't have to give the key or the beeper or both. We read the order as requesting the municipalities to perform the test as to whether or not these urbanizations must nonetheless, even though they gave the key, the beeper, or the access code to the plaintiff, the municipalities must go ahead and perform the whole test to see if they must transition to having a man-gate community. So that is an issue because from our point of view, if George Hill Peace Remedy complies and this court finds that it is okay in the sense that it gives plaintiff access to these communities, why then the municipalities must continue dealing with the issue of special justifications when they will have unfettered access 24-7, 365 days per year? Okay, so what you would like, as I understand it, is for us to clarify the situation as to special justification. And if I understand you correctly, the municipality doesn't feel that it should be the arbiter of special justification to get you out of that equation. At this point of the game, yes. We are totally agreed with what Judge Selvia is mentioning. The second big issue for us, and San Juan in particular, had this situation with a beeper that for some reason, maybe the urbanization changed the code, maybe the battery was faulty. But the beeper didn't when the plaintiff went to visit this urbanization. They couldn't get in. They filed a motion. We couldn't get into this urbanization. Quite frankly, for San Juan and other municipalities to be micromanaging if the beeper indeed works, if the battery is okay, or if the urbanization changed the code afterwards is really burdensome. We really thought that once we gave the key, the beeper, both, or once we comply with Judge Helpy's order, then if plaintiffs couldn't get to one of those urbanizations to which we already gave them the beeper, they would move the court concerning that particular urbanization, either in Puerto Rico local court or in federal court against that particular urbanization. But we feel that we are stuck, and San Juan has invested a lot of time and resources from the municipality trying to accommodate plaintiff's request. We have to take the beeper first to Guaynabo, now to Cahuas, far away from San Juan, take the officer from other office to comply with plaintiff's request. And we really feel that that, in the practical sense of the order, is really burdensome for the municipality. So what's the alternative? The alternative really, Your Honor, very respectfully would be once we comply and gave the 52 beeper and key and they have access, if for some instance either the battery is not working or the urbanization decided to talk among themselves to change the code, that they move the court accordingly concerning that particular urbanization, not against the municipality. So you want out as a middleman and you want a declaration that if there's a problem with a particular urbanization, that gets worked out between the plaintiff and the particular urbanization. Certainly, Your Honor. And they're going to say that doesn't work. Well, we don't understand why that wouldn't work. Why can't you solve the problem simply by putting appropriate conditions in the permits that you issue to the urbanizations, requiring that they not only turn over the key or the access code, but that they keep them current and providing that if they don't do that, that they will then indemnify the municipality for any costs or expenses or indeed put their urbanization permit itself in jeopardy. And it seems to me that you have a pretty big stick when it comes to the urbanizations because they can't exist without a permit from the municipality. I understand your point and you are correct in the sense that we may do that. But quite frankly, if after we do and take all those measures, if the urbanization still decides not to comply, then plaintiff will come to court against the municipality and we will get sanctions for things that we cannot control because if the urbanization changed the beeper code, we will not have knowledge of that. In fact, the order requests us to provide the new beeper or the new code within 24 hours of its change when if we were not notified, how will we know about it? Okay. Judge Selya has suggested that there are additional steps that you could take. And do I hear you saying that you are willing to take those steps? If the need comes, definitely, Your Honor. What we are worried is that even though we take all those steps, we will never be able to really be sure that the urbanizations are complying and we will be declared in default or in contempt of the court for their shortcomings. And the 24-hour rule is of particular concern to you. For San Juan it is, Your Honor, very respectfully. Thank you very much. Thank you. Good morning. May it please the Court, Susana Peña-Garigan on behalf of the Commonwealth officials. Your Honor, plaintiffs are seeking to bring the Commonwealth officials to this case in order to circumvent the path they chose to follow in knowingly not amending the complaint as instructed to bring the municipalities that are the ones with authority to provide a remedial scheme  Also, there is no evidence in record of any constitutional violation on the part of Commonwealth officials. And plaintiffs are indeed requesting the Court to instruct the Commonwealth officials on how to regulate and conform to state law. I would like to address quickly the issue of the Suspended Dismissal. Well, that issue was brought briefly before this Court in the last oral argument and Chief Judge Lynch I think we probably move beyond that. That said, it was already fair. I would like to go now to the issue of the enforcement and plaintiffs Well, you know, they argue you're a necessary party or at least that your involvement as to remedy would make it more likely that they receive an effective remedy. Why don't we talk about that? Sure, Your Honor. Our answer to that would be, first, the Court relied and focused on the municipalities' authority to provide a remedial scheme. We cannot provide that. That's an issue that was decided by this Court since the 2011 decision. We did not direct the municipalities to implement the law. We do not participate, and that's an issue that has been decided by this Court already since 2011. Also, the municipalities have worked actively to provide action plans and they have enforcement mechanisms, including the municipal police. All the defendants in here have municipal police contact numbers provided through the Court for them to call them if necessary. Furthermore, there is no evidence in the record of any complaints filed against the police department, the Puerto Rico Police Department, or any policy or pattern showing that the police department is failing to comply with the mechanisms of assisting them to gain access. There are three instances mentioned in the reply brief. There are three instances in Aguas Buenas, Luquillo, and Omacaw. Those three instances, isolated instances, were never, never briefed in the principal brief, despite the fact that they occurred in September and the brief was filed in November. Never mentioned whatsoever. However, even if we take it into consideration, the letters that they filed regarding those instances do not constitute evidence. Those issues are regarding mandated communities, and plaintiffs stated here today that they are very much content with the result, the remedy they got with man gates. Also, the issue of the man gates is regarding non-parity party municipalities that were not brought to the case, and there is no established policy, and the fact that there are low-level police officers that are making a mistake due to ignorance of the law in few instances, in this case we are talking about three instances in municipalities that were not included, does not provide for a policy or pattern actionable under Section 1983. I would also like to address the fact... Let me just, as an informational matter, ask whether the Commonwealth has given any form of instructions to its police pertaining to the enforcement of the plaintiff's rights. Yes, Your Honor. First of all, we did comply with the court's order. It's in docket 981 and 983. We provided transcripts of the oral argument in March of 2013. We provided copies to the court, copies of the letters to the governor, to the police superintendent through... No, no, no, no. You may have given a letter to the police superintendent. Has the police superintendent given any instructions to the line officers? Yes, Your Honor. There is, in April of 2013 and April of 2012, the superintendent of police issued administrative orders, one to the police academy and the other one to all regional directors, offices, bureaus and divisions and other units. And in there, the court, and I have the letters, the administrative order... Is it in the record? No, it's not in the record. We understand that we comply with the court's order. We provided evidence that the governor and the superintendent received every notice of everything. And since we're not in the case, but these are administrative orders. They're accessible. Would you counsel supply us with copies of those after the argument by a Rule 28J letter with copies to the other parties? Sure. No problem, Your Honor. However, if I would be allowed time to translate them... Yes. It would be helpful. Yeah, because they're not translated. So I would require time to translate them, and I certainly will provide the court with that. However, the court, the Commonwealth are indeed enforcing the fact that there might be a couple of low-level police officers. They're ignoring the law at the time. It doesn't provide for any of that. Also, there's an issue about the authority to regulate. Your Honor, there's nothing in the record whatsoever about any challenge to the regulation. We'll take that on your briefs. You've argued that well. Okay. Thank you, Your Honor. Thank you. This court well knows that the speech activity at play here is the lifeblood of the democracy, and this court also well recognizes that Puerto Rico has a serious crime problem. Jehovah's Witnesses understand that, too. There are 26,000 Jehovah's Witnesses who live in Puerto Rico. But we submit that when this court ordered unmanned urbanizations to retain guards, that the court got the calculus right. It balances the significant First Amendment issues against the significant security issues of the Puerto Rico citizenry. The special justification we submit was crafted as a limited exception for a very small number of urbanizations, but in Judge Helpe's view, that has now become the rule for almost half of the urbanizations, which we submit puts an onerous burden on speech, as we heard from San Juan. It's at that point that you believe District Judge, in effect, altered our order. Is that correct? That's correct, Judge Ripple. As I understand what Judge Helpe has done with special justification, he's ordered the inquiry into special justification and the decision as to whether special justification exists to be made by the municipalities. Do you object to that framework? Yes, Your Honor. My reading of this court's order is it put the burden on the district court to make that assessment, the burden on the urbanization. Can I caution you? Yes, Your Honor. I don't think you're helping your case by referring to your reading of our decision. You do help your case when you talk in terms of you're not getting effective relief or you're not getting a fulfillment of your client's First Amendment rights. Let me pick up on that, Your Honor. When we look at San Juan's position in front of this court, when it says that it's burdensome for them, the government, to exercise their public function to ensure access to public streets, it well illustrates the burden that's being put upon the advocate. And we submit that there's been a shifting of responsibility and burden in this case. You're number one, you would like man gates. Correct, Your Honor. If you can't have man gates, you want the municipalities to take responsibility for the failures of their urbanizations because you want fewer people to have to deal with? Is that what it? Yes, Your Honor. Those are our state actors. We think the paradigm is that public access to public streets should be virtually unfettered, as it is everywhere in the United States. Now, with respect to the Commonwealth, this court did not dismiss the Commonwealth. They were proper parties to the case. They've not made any showing as to why they should not be a proper party. They made representations to the district court and to this court that they would take all necessary measures, but yet the Solicitor General, in response to a letter saying, can you please have your police help us, never responded the way we heard counsel respond today. Yes, there are administrative orders. We apologize they're not being followed. What they told us is, in essence, the police cannot help. So we submit that they need to be restored to the case so that we can ensure their vibrant participation. Thank you. Thank you very much.